Tate *v.* Philadelphia Transportation Company, Appellant.

Argued January 30, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

Frederic L. Ballard, Jr., with him Tyson W. Cough-lin, Charles I. Thompson, Jr., Peter Platten, and Bal-lard, Spahr, Andrews & Ingersoll, for appellant.

James L. Stern, Deputy City Solicitor, with him Herbert B. Newberg, Ellis A. Horwitz, James L. J. Pie and Matthew W. Bullock, Jr., Assistant City Solicitors, for appellees.

OPINION BY MR. CHIEF JUSTICE BELL, April 16, 1963:

This is an appeal from a decree appointing a temporary receiver for the Philadelphia Transportation Company (hereinafter referred to as P.T.C.). P.T.C. is a privately owned utility company which owns and/or operates the transit system of and in the City of Philadelphia, furnishing public transportation therein by street car, bus, subway and elevated railway.* Some of the facilities of transportation, viz., certain subways and elevated railway lines, are the

---

* Public transportation by taxicab is furnished by others.

property of the City which leases such facilities to the P.T.C. For the use of these facilities, P.T.C. pays the City a substantial license fee in lieu of a minimum rental, and the City is entitled to a share of P.T.C.'s profits in excess of a specified amount. P.T.C. also pays the City a rental on 270 subway and elevated railway cars. By virtue of certain agreements between the City and P.T.C., the City has an option to purchase from P.T.C. the facilities of the transit system which the City does not already own; and City Council has a right to select several members of the P.T.C.'s Board of Directors, in addition to the Mayor, who is, ex officio, a director of that Company.

On January 15, 1963, the contract between P.T.C. and the Transport Workers Union of America, AFL-CIO, representing employees of the P.T.C., expired. For many days prior to January 15th, the P.T.C. and the Union, with the aid of Federal, State and local mediators, had bargained "collectively" concerning the terms of a new contract, but their efforts were unsuccessful. Because the company and the union had been unable to agree on the terms of a new contract prior to January 15th, the union declared a *strike* on that day.

It is a matter of widespread common knowledge, of which we take judicial notice, (1) that this strike brought about a complete cessation of all *such* public transportation in the City and caused great hardship (a) to all those persons who needed transit facilities to reach their place of business or employment and (b) to those persons whose illness necessitated a trip (by public transportation) to a hospital, and (2) that business and travel in the City were substantially paralyzed by the strike and (3) that due to the strike, the financial loss to the P.T.C., to the members of the union, to the City, to business firms and to places of recreation in the City was enormous.

On January 18, 1963, three days after the commencement of the strike, the City, through Mayor Tate and two City selected directors of P.T.C., filed a Complaint in Equity praying for the appointment of a temporary receiver for the P.T.C. and for additional relief. In the Complaint plaintiffs averred, inter alia, several of the above recited facts. They also averred that (a) by its refusal to permit the incorporation of any "no lay-off" clause in any proposed agreement with the union, P.T.C. was not bargaining in good faith; (b) that the continuance of the strike was not only working extreme hardship to all the citizens of Philadelphia, but was also subjecting the City, in its proprietary capacity, to irreparable financial damage and that this was due to the company's failure to properly operate the transit system and to properly maintain the facilities of that system belonging to the City, thereby causing a loss of current rentals, as well as a probable permanent loss of patronage by the P.T.C. and consequent loss of rentals to the City. Complainants also averred that P.T.C.'s conduct of negotiations with the union, its refusal to agree to a "no lay-off" clause, and its insistence on an increase in fares before any agreement could be made with the union constituted "gross mismanagement" and *tended* to impair its solvency.

The relief prayed for in the Complaint was that the Court grant preliminarily an order restraining P.T.C. from (a) insisting upon the granting of a fare increase by the State Public Utility Commission prior to the execution of a new agreement with the union; (b) failing properly to maintain its transit facilities; (c) committing further waste; (d) refusing to bargain with its employees in good faith. The complainants also requested the Court to appoint a receiver to take possession of all the assets and property of P.T.C. and to operate its transit facilities "until a new labor agreement between P.T.C. and the representations of its em-

ployees has become effective." General relief was also prayed for.

The Court entered a Rule upon P.T.C., returnable January 22, 1963, to show cause why the relief prayed for should not be granted. Preliminary objections filed by the defendant on January 21st were overruled on January 22nd. On January 24th the P.T.C. filed a responsive answer admitting many factual averments in the complaint but denying all of appellees' averments of law and conclusions, including the right of the City to the relief prayed for. Included in such Answer was New Matter in which P.T.C. averred that it had been engaging in collective bargaining in good faith, and that none of the representatives of the City who were members of P.T.C.'s Board of Directors had suggested the desirability of adopting different policies, and that Mayor Tate had entered into the negotiations contrary to the wishes of defendant and had interfered with and obstructed defendant's negotiations. P.T.C. prayed for an injunction against the plaintiffs to restrain them from further interference with collective bargaining between P.T.C. and its employees. No reply to New Matter was ever filed by the complainants.

Under the aforesaid facts, the averments of fact made by each party which were undenied were thus admitted, but not the pleaders' conclusions or matters of law: *Bogash v. Elkins,* 405 Pa. 437, 176 A. 2d 677; *Ross v. Metropolitan Life Insurance Co.,* 403 Pa. 135, 169 A. 2d 74; *Dumont Television & Radio Corp. v. Franklin Electric Co.,* 397 Pa. 274, 154 A. 2d 585; *Erie v. Gulf Oil Corp.,* 395 Pa. 383, 150 A. 2d 351; *Silver v. Korr,* 392 Pa. 26, 139 A. 2d 552. While the parties disagreed on matters of law and conclusions, and which side or what was the real cause of the failure to agree on a new contract, there were no substantial factual differences between the parties.

On January 26, 1963, the Court, after hearing arguments of counsel, but without hearing any testimony, entered a Decree, the pertinent portions of which are as follows: .

"WHEREAS, a great emergency has arisen by which the operation of transportation in the City of Philadelphia has ceased and the inhabitants of Philadelphia are subjected to great hardship involving public health, safety and welfare; and the parties in controversy, the defendant corporation and the union employees, have not been able to adjust differences to prevent this situation from continuing; and because of the public interest involved in this matter;

"Now, to wit, this 26th day of January, 1963, upon consideration of the complaint and answer and the present great public emergency resulting from the cessation of operation of defendant's transit facilities, and on motion of counsel for plaintiffs, it is ORDERED, ADJUDGED AND DECREED as follows:

"(a)    That Honorable Horace Stern is hereby appointed temporary receiver of all the assets, property, franchises, rights and privileges of whatsoever kind of the Philadelphia Transportation Company within the jurisdiction of this Court, the said appointment to continue until further order of the Court or until such time as a collective bargaining agreement shall have been entered into and approved by the unions and the defendant company.

. . .

"(c)    That the receiver shall use his best judgment and extend every possible effort *to put an end to the cessation of operation of the transit facilities** of the defendant and to cause the facilities of the defendant to be operated forthwith in the public interest and in the alleviation of the gross inconvenience and hardship which said cessation has caused.

---

* Italics throughout, ours.

"(d) This decree is not to be deemed as in any way precluding the continuance of negotiations between the unions and the defendant company looking towards the consummation of a collective bargaining agreement."

In the interest of Justice, a Judge should constantly attempt to become wiser, more analytical and discerning, and more perceptive of the realities which sometimes exist in a case, no matter how they are concealed or camouflaged or obscured by a smoke screen. It is transparently clear—indeed it was admitted in open Court—that the real objective of the suit, and the real objective of the Court was undoubtedly a worthy one, namely, to end the strike and, if possible, to persuade the parties to enter into a new contract. It is crystal clear that the P.T.C. was not insolvent, and that even the new and distinguished temporary receiver could not compel the union members to work and could do absolutely nothing to operate the transit system, or to prevent further financial loss to the P.T.C. or to the City. Furthermore, neither the Court nor a receiver could compel the Company or the union to bargain in good faith—the jurisdiction of this issue lay solely in the Pennsylvania Labor Relations Board or the National Labor Relations Board: *Garner v. Teamsters Union*, 346 U. S. 485; *Teamsters Union v. N.Y., N.H. & H.R. Co.*, 350 U. S. 155; *Wax v. International Mailers Union*, 400 Pa. 173, 161 A. 2d 603; *Navios Corp. v. National Maritime Union of America*, 402 Pa. 325, 166 A. 2d 625; *Terrizzi Beverage Co. v. Local Union No. 830*, 408 Pa. 380, 184 A. 2d 243. Cf. also *Bright v. Pittsburgh Musical Society*, 379 Pa. 335, 108 A. 2d 810.

## Right to Strike

Moreover, it is equally clear that neither a public emergency nor any relevant fact herein gave the Court below any power either directly or indirectly to sub-

stitute itself or its agent for one of the two bargaining parties, in this case, the employer, or to enter the challenged decree. Worthy objectives and desirable goals are not sufficient (1) to justify a violation (a) of the law, or (b) of Constitutionally ordained rights of property, or (2) to shackle, eliminate or extirpate collective bargaining. The quickest solution would of course have been to enjoin the strike, which we emphasize was called and carried on by the union and was causing such great damage to the public interest and public welfare—but such an injunction would have been illegal. This was a peaceful strike for a lawful purpose, i.e., an increase in wages and benefits as well as improvements in working hours and conditions; and a *peaceful strike, like peaceful picketing, conducted in a lawful manner and for a lawful purpose is lawful* even though it shuts down, bankrupts or puts out of business the company or firm which is struck and even though it also causes enormous and irreparable damage to hundreds or thousands of innocent persons who are not involved in the strike. As to the right to conduct a peaceful strike in a lawful manner and for a lawful purpose, see: *Jefferson and Indiana Coal Company v. Marks,* 287 Pa. 171, 177, 134 A. 430; Act of June 1, 1937, P. L. 1168, as amended, 43 PS §211.1 et seq.; Act of June 2, 1937, P. L. 1198, as amended, 43 PS §206(a) et seq.; also Labor Management Relations Act, 29 U.S.C., §163, (July 5, 1935, ch. 372, §13, 49 Stat. 457; Labor Management Relations Act, June 23, 1947, ch. 120, title I, §101, 61 Stat. 151.) ; *National Labor Relations Board v. Fansteel Metallurgical Corporation,* 306 U. S. 240, 256; *National Labor Relations Board v. Remington Rand,* 94 F. 2d 862. As to peaceful picketing in a lawful manner and for a lawful purpose, see: *Wortex Mills, Inc. v. Textile Workers Union of America, C.I.O.,* 369 Pa. 359, 369, 85 A. 2d 851, and cases reviewed and cited therein.

Furthermore, a Court cannot eliminate or destroy the right of collective bargaining, or substitute itself for one of the parties, or compel the parties to enter into a contract, or make one for them, unless the legislature or Congress passes appropriate legislation to change the present law.

Although the law of this State (Act of June 30, 1947, P. L. 1161, §1, 43 PS §213.1 et seq.) has limited the right of employees of certain utilities to strike, neither that Act nor any other Act has prohibited strikes in the transit-utility field, or authorized a Court to decree or enforce *compulsory arbitration*. Many believe that the interests of the public demand that the law be extended to bar strikes in the field of mass transportation but that solution is a matter for a legislature. Absent such legislation, we repeat, that the Court *in a case such as this,* cannot grant injunctive relief against a union, nor directly or indirectly make collective bargaining compulsory, or by seizure or receivership, substitute itself or its agent for one of the contracting parties.

## Receivership

We turn now to the subject of receivership. This is not the case of a receivership for an insolvent corporation which is governed by statute. Act of June 4, 1901, P. L. 404, 39 PS §31. This case involves the appointment of a temporary receiver for a solvent corporation. A receivership in the present case was an obvious transparent subterfuge in an attempt to achieve a highly desirable goal, i.e., a settlement of the strike and the strikers return to work. The law with respect to receivers is aptly stated in 75 C.J.S., §15, pages 676-677: "the courts have found it difficult or impossible to lay down positive and unvarying rules which will cover and apply to all cases which may arise; . . . .

"The power to appoint a receiver is a delicate one, which is jealously safeguarded, and reluctantly exercised, by the courts. The power should be exercised sparingly, with caution and circumspection, and only in an extreme case under extraordinary circumstances, or under such circumstances as demand or require summary relief."

Nevertheless certain guideposts have been erected, and general rules adopted, by the Courts. All authorities are agreed that a receivership of a solvent corporation is a drastic remedy and should be granted only when (1) the right to a receivership is free from doubt, and (2) a receivership is clearly required by the facts and circumstances and equities of the particular case. More particularly: a receiver should be appointed (a) only when the right to a receivership is clear,* and (b) irreparable damage will in all probability result unless a receiver is appointed, and (c) a receivership will not substantially injure or interfere with the rights of creditors and stockholders, and (d) greater damage will result if a receiver is not appointed than if one is appointed. Moreover, a receiver will be appointed only in aid of some recognized presently existing right, and no appointment will be made in a case where a receivership is the sole remedy prayed for.** In addition to the above mentioned situations, a receiver may be appointed by the Court where there has been such gross

---

* *Truscott v. Yiddisher Kultur Farband*, 382 Pa. 553, 116 A. 2d 555; *McDougall v. Huntingdon & Broad Top Mountain Railroad & Coal Co.*, 294 Pa. 108, 117, 143 A. 574; *Chicago & Allegheny Oil & Mining Co. v. U. S. Petroleum Co.*, 57 Pa. 83; 31 P.L.E., Receivers, §1, p. 151.

** *Bowman v. Gum, Inc.*, 321 Pa. 516, 184 A. 258; *McDougall v. Huntingdon & Broad Top Mountain Railroad & Coal Co.*, 294 Pa., supra; *Hall v. City Park Brewing Co.*, 294 Pa. 127, 143 A. 582; *Hogsett v. Thompson*, 258 Pa. 85, 101 A. 941; *Chicago & Allegheny Oil & Mining Co. v. U. S. Petroleum Co.*, 57 Pa., supra; *Globe Solvents, Inc. v. Nouskhajian*, 148 Pa. Superior Ct. 202, 24 A. 2d 687.

mismanagement or fraud or similar circumstances that a receiver is clearly required.*

Perhaps we should add that a receiver will not be appointed (a) when an application is not made in good faith; 75 C.J.S., Receivers, §18, page 683; or (b) as a weapon of coercion or (c) as a means of frustrating a public policy of the State—in this case collective bargaining: *Shapiro v. Wilgus*, 287 U. S. 348, 356.

In the leading case of *McDougall v. Huntingdon & Broad Top Mountain Railroad & Coal Co.*, 294 Pa., supra, the Court, in a comprehensive review of the subject, said (page 117): "There is nothing, however, which affects a corporation with such serious consequences as does the appointment of a receiver; . . . . The court, before any appointment is made, will act with the utmost caution. Receivers will not be appointed unless the chancellor is convinced the *right is free from doubt* (Howeth v. Coulbourne Bros. Co., 115 Md. 107, 80 Atl. 916), *the loss irreparable,* with no adequate legal remedy, and *the relief sought is necessary.* Receivers are appointed only in aid of some recognized, presently existing legal right, and will not be appointed where receivership is the sole relief asked."

In *Bowman v. Gum, Inc.*, 321 Pa., supra, the Court said (page 525): ". . . A temporary receiver may not be appointed for a solvent corporation on the mere conjecture of a stockholding interest (even if it represents one-half the shares) that the other half may not succeed. . . . It is, of course, a laudable hope, as was said below, that if a temporary receiver is appointed, quarreling interests will compose their differences; they may, or they may not; in this case they did not. Each

---

* *Bowman v. Gum, Inc.*, 321 Pa., supra; *Hlawati v. Maeder-Hlawati Co.*, 289 Pa. 233, 137 A. 235; *Globe Solvents, Inc. v. Noushkhajian*, 148 Pa. Superior Ct., supra; 75 C.J.S., Receivers, §18, pp. 682-684; 43 A.L.R. 243-317, 61 A.L.R. 1212.

interest chose to stand on its legal rights. But that fact, on the averments of the bill and the evidence, did not authorize the court to take the property from the management and control of the owners and turn the management over to a receiver; prima facie, neither party had violated any law when the temporary receiver was appointed. 'Receivers are appointed only in aid of some recognized, presently existing legal right, and will not be appointed where receivership is the sole relief asked': *McDougal v. Huntingdon & B. T. Mt. R.R.*, 294 Pa. 108, 117, 143 A. 574, supra." See also: *Hall v. City Park Brewing Co.*, 294 Pa. 127, 143 A. 582; *Hogsett v. Thompson*, 258 Pa. 85, 101 A. 941; *Chicago & Allegheny Oil & Mining Co. v. U. S. Petroleum Co.*, 57 Pa. 83; *Globe Solvents, Inc. v. Nouskhajian*, 148 Pa. Superior Ct. 202, 24 A. 2d 687.

The facts in this case do not bring it within any recognized ground for the appointment of a receiver; on the contrary, the foregoing principles and authorities clearly demonstrate that there was no justification for a receivership.

This is not the first instance in which Government or a Court has sought to interfere in a labor dispute and to coerce one party to the collective bargaining process, viz., the employer, *by seizing its property*. The present case is ruled not only by the aforesaid principles and authorities, but it is also further ruled in principle by the leading case of *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U. S. 579. In that case the Supreme Court of the United States denied a right of seizure and possession in a case far stronger for receivership and seizure than the instant case. In that case the highest and most powerful public official in our Country, the President of the United States—supported by all the express and implied powers of his office arising (a) under the Constitution and (b) by statute and (c) by virtue of and in his capacity as

Commander-in-Chief of the Armed Forces of the United States (and) at a time when the Nation was at war in Korea—seized the properties of certain steel companies whose employees were on strike. The President by executive order directed the Secretary of Commerce "to seize and operate" the mills. The goal and the objective in that case was exceptionally desirable—to keep the mills working for the welfare of our entire Country. In order to justify this temporary seizure the President alleged that his action was taken in order to protect, preserve and promote the national security, but the effect was the same as in the present action and decree—to take from the employer his property and his right to operate his property and to bargain freely with a labor union. The Supreme Court of the United States expressly, specifically and flatly decided in that case that the attempted temporary seizure of the steel mills—even in time of war and for an exceptionally worthy objective—was illegal and unconstitutional!

As appellant aptly states in its brief:

"What cannot be done by outright seizure cannot be done by seizure masquerading as receivership. A deprivation by the state of an owner's use of his property—although resorted to by indirect means—is a 'taking' which must meet all the requirements of due process and for which compensation must first be made." *Miller v. Beaver Falls*, 368 Pa. 189, 82 A. 2d 34; *Sansom Street. Caplan's Appeal*, 293 Pa. 483, 490, 143 A. 134; Fourteenth Amendment to the Constitution of the United States, and Article I, §1, and Article XVI, §8, of the Constitution of Pennsylvania.

We shall discuss one more contention of appellees. Although the public emergency was undoubtedly caused by the union's strike, appellees contend that the receivership was justifiable because of (a) the great emergency, and (b) the City's substantial proprietary

interests which are summarized above. We find no merit in this contention. The City's interest gives it a standing as a party complainant but for the reasons hereinabove set forth, gives it no right to the relief sought or to the decree granted.

To summarize: The test in an appellate Court is whether there has been an abuse of discretion by the lower Court, or an error or misapprehension of the law. We find no justification in the law or in applicable principles of equity for the appointment of a receiver, temporary or otherwise, for P.T.C., or for the decree of the lower Court.

Decree reversed; costs to be paid by the City of Philadelphia.

Mr. Justice BENJAMIN R. JONES concurs in the result.

Mr. Justice MUSMANNO dissents.

––––––

DISSENTING OPINION BY MR. JUSTICE COHEN:

I must dissent.

Even though it was clearly pointed out at argument that *Youngstown Sheet and Tube Co. v. Sawyer,* 343 U. S. 579, is no authority for and has no application to the majority's position, since the seizure in the *Youngstown* case was by executive order and hence different from the case before us where the receivership was decreed by a properly established judicial tribunal, the majority still persists in citing the *Youngstown* case as precedent—which to me it most certainly is not.

I would affirm the lower court's determination that a receiver was necessary to prevent waste since the City of Philadelphia has over $200,000,000 invested in the P.T.C.; and further, because I am certain that the receiver whom the court had appointed would have been able to terminate the labor dispute.